IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 1, 2012 Session

## LEONARD JASPER YOUNG v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 00-04018    Paula Skahan, Judge**

_____

**No. W2011-00982-CCA-R3-PD  - Filed June 27, 2013**

_____

The Petitioner, Leonard Jasper Young, appeals from the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief as it relates to the guilt phase of his trial.  The post-conviction court granted the Petitioner relief as to the sentencing phase, and the State did not appeal this ruling.  A Shelby County jury convicted the Petitioner of premeditated first degree murder, especially aggravated kidnapping, and theft over $1,000. He received an effective sentence of death plus seventy-two years.  On appeal, the Petitioner asserts that trial counsel were ineffective during the guilt phase of his trial.  We affirm the judgment of the post-conviction court denying the Petitioner post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Joseph S. Ozment and Paul Kellison Guibao, Memphis, Tennessee, for the appellant, Leonard Jasper Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County jury convicted the Petitioner of first degree premeditated murder, especially aggravated kidnapping, and theft over $1,000.  The jury sentenced the Petitioner to death for the murder conviction, applying three aggravating circumstances: (1) the Petitioner was previously convicted of one or more felonies, other than the present charge,

the statutory elements of which involve the use of violence to the person; (2) the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Petitioner or another; and (3) the murder was knowingly committed, solicited, directed, or aided by the Petitioner, while the Petitioner had a substantial role in committing or attempting to commit theft. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7). The trial court sentenced the Petitioner as a career offender to sixty years for the especially aggravated kidnapping conviction and twelve years for the theft conviction. The trial court ordered that the sentences be served consecutively to each other and to the death sentence. The Tennessee Supreme Court affirmed the Petitioner's convictions and sentences on direct appeal. See State v. Young, 196 S.W.3d 85, 94 (Tenn. 2006).

The Petitioner subsequently sought post-conviction relief. Following an evidentiary hearing, the post-conviction court entered an order denying relief regarding the guilt phase and granting relief regarding the penalty phase. The Petitioner appeals the denial of relief regarding the guilt phase.

## TRIAL PROCEEDINGS

On direct appeal, the Tennessee Supreme Court summarized the evidence presented at trial as follows:

> Jessie Cochran testified that she met [the Petitioner] in 1990 and dated him intermittently through 1993. On November 16, 1999, Ms. Cochran returned home to find [the Petitioner] in her house, uninvited. [The Petitioner] had a sawed-off shotgun but did not threaten her with it. They spoke for about forty-five minutes. [The Petitioner] then left, requesting, "Please do not call the law." After [the Petitioner] left, Ms. Cochran began checking to see if [the Petitioner] had taken anything. As she looked out one of her windows, she saw her Mercedes-Benz car being driven down the driveway. She reported the theft, and her car was subsequently located about twenty-three miles away in Ashland, Mississippi. Ms. Cochran explained that her farm was located about one and one-half miles from the Mississippi border "if you went straight through the woods." After [the Petitioner's] appearance, Ms. Cochran left her home and stayed with a relative until December 11, 1999.

> After abandoning Ms. Cochran's car, [the Petitioner] found a Bronco kept in a locked storage building on a farm in

Benton County, Mississippi, just south of Ashland, Mississippi. The keys were still in the Bronco, as well as several guns. [The Petitioner] took the Bronco and drove to Memphis. The Bronco's owner, Mr. Richard Rice, identified a photograph of the Bronco at trial.

Virginia Davis, [the Petitioner's] niece, testified that [the Petitioner] came by her residence in Midtown Memphis on a Thursday evening in November 1999. [The Petitioner] was driving a Bronco. Ms. Davis identified the Bronco as the same one pictured in the photograph identified previously by Mr. Rice. Ms. Davis stated that [the Petitioner] visited with her for about forty-five minutes. He asked her if she had a car; she did not. He also asked if her father still lived in Texas, to which she replied in the affirmative. [The Petitioner] told Ms. Davis he was going to Texas to visit her father. [The Petitioner] left at about 5:00 p.m.

Two days later, on a Saturday, [the Petitioner] returned to Ms. Davis' residence in Midtown Memphis, still driving the Bronco. He parked the Bronco nearby and walked to her house. She did not admit him because, in the meantime, police officers had visited her. During their visit, she learned some things about [the Petitioner] that she was not "happy with." However, she advised [the Petitioner] that "the law been there looking for [him]." Pursuant to the officers' instructions, Ms. Davis contacted them about [the Petitioner's] second visit.

Kathryn Crane testified that, in November 1999, she was employed by Seessel's, a supermarket located in Midtown Memphis. She was the store's bookkeeper. Ms. Crane identified a cash register receipt generated by the store dated November 20, 1999, at 5:27 p.m. Ms. Crane also identified a debit card receipt for the purchase reflected by the cash register receipt.

Michelle Naef testified that she was a graduate student at the University of Memphis in the fall of 1999, studying for a master's degree in philosophy. She and the victim, Ms. Hillary Johnson, were teaching assistants for the same professor and

became friends. That fall, the victim lived "on McLean and Linden." Ms. Naef and the victim had planned to spend time together on Sunday, November 21, 1999. The victim had agreed to call Ms. Naef that Sunday morning to confirm their plans.

Ms. Naef last spoke with the victim on the morning of Saturday, November 20, 1999. When Ms. Johnson did not call the next morning as had been arranged, Ms. Naef called the victim at about 11:00 a.m. but did not receive an answer. Ms. Naef left a message. Not hearing back, Ms. Naef called again in the early afternoon and left another message. With still no return call, Ms. Naef called a third time. This time, the victim's answering machine was full and not taking additional messages. At this point, Ms. Naef became "scared." Ms. Naef and "all of the graduate students" spent the next several days searching for Ms. Johnson in person, over the phone, and by posting signs.

On Sunday, November 21, 1999, Officer Jeffrey Herbison of the Memphis Police Department found the Bronco parked near Ms. Davis' residence. He waited for someone to return to the vehicle, but no one did. After some hours, the police department towed it away. Officer Herbison identified on an aerial photograph the locations of Seessel's, Ms. Davis' apartment, the place where the Bronco was found abandoned, and the victim's residence. Officer Herbison testified that all of these places were located in Memphis, Shelby County, Tennessee.

Nancy McPike testified that her daughter, the victim Hillary Johnson, moved from Chicago to Memphis in August 1999 to attend graduate school at the University of Memphis. After arriving in Memphis, Ms. Johnson purchased a white Hyundai automobile for $1,350. On Friday, November 19, 1999, Ms. McPike spoke with her daughter over the phone. Ms. McPike called Ms. Johnson on Sunday, November 21, 1999, but did not receive an answer. She called again late Sunday night, but again received no answer. After speaking with several of her daughter's friends, Ms. McPike contacted the police. Ms. McPike identified a jacket shown to her at trial as belonging to her daughter.

-4-

During the late afternoon of Saturday, November 20, 1999, [the Petitioner] carjacked Hillary Johnson as she was sitting alone in her car at a stop sign in Midtown Memphis, Shelby County, Tennessee. [The Petitioner] forced Ms. Johnson into the passenger seat of her car, and he began driving. [The Petitioner] drove Ms. Johnson to a remote location in Fayette County, Tennessee. There, he stabbed her once in the back with such force that the knife blade remained embedded in her body, the handle detached. [The Petitioner] dragged Ms. Johnson about twenty yards and concealed her under a sheet of tin near an old agricultural fuel tank. [The Petitioner] left Ms. Johnson to die of the knife wound. He left the site of the killing in Ms. Johnson's car and drove out of state, still trying to avoid his apprehension.

[The Petitioner] returned to southwest Tennessee several days later. He hid Ms. Johnson's car behind an old abandoned house and walked to Jessie Cochran's residence. [The Petitioner] entered her house when he found it unoccupied.

Lieutenant Rick Marlar of the Mississippi Highway Patrol testified that, on November 29, 1999, he overheard a broadcast that Ms. Johnson's car had been found hidden behind an old house in Tippah County, Mississippi. He reported to the scene; he described the area at trial as "very rural." Because he was already involved in the search for [the Petitioner], he and accompanying officers proceeded to Ms. Cochran's house, which was only a short distance away. As Lt. Marlar looked through a window, he saw [the Petitioner] sitting inside the house, watching television with a 9 mm. gun laying nearby. Speaking through the window, Lt. Marlar ordered [the Petitioner] to "freeze." [The Petitioner] made a move toward his gun, causing Lt. Marlar to threaten to "kill him." [The Petitioner] then raised his hands. Officers broke through the door and took [the Petitioner] into custody. On [the Petitioner's] person were discovered a .22 pistol and a knife. Lt. Marlar advised [the Petitioner] of his Miranda rights immediately after arresting him.

Lieutenant David Shaw of the Mississippi Highway

Patrol arrived and questioned [the Petitioner], again advising him of his Miranda rights. [The Petitioner] executed a written waiver of his rights and stated he would answer Lt. Shaw's questions. Lt. Shaw described [the Petitioner's] demeanor as "calm and cooperative." Lt. Shaw took an audio recording of his interview of [the Petitioner], which was subsequently transcribed. The audio recording was played for the jury, and the jury was further provided with copies of the transcript.

During this November 29 statement, [the Petitioner] admitted to taking Ms. Cochran's car. When the police then "got after" him, he "hit the woods" and "jumped out." He remained in the woods two or three days when he found the storage building in which the Bronco was located. He took the Bronco and drove to Memphis, where he visited his niece, Virginia. He then drove to Texas, looking for Virginia's father. Unsuccessful in his search, [the Petitioner] returned to Memphis. He parked the Bronco near his niece's residence and walked to her apartment. She told him that "the law been there looking for [him]." He then "[t]ook off running." He saw a "girl at a stop sign" in a white car. He "jumped in the car" on the passenger's side and made the driver pull over. He "grabbed her around the neck" and made her switch places with him. He then drove them out Highway 64. [The Petitioner] stated that he dropped the woman off on Highway 64 after taking some credit cards from her. He then drove the woman's car into Alabama and on into Florida. After several days, he returned to Ms. Cochran's residence. He left the white car "off a gravel road behind an old house" and walked from there to Ms. Cochran's house.

[The Petitioner] denied that the driver of the white car had been with him at the old house where he left the car. He stated that he had two pistols with him when he jumped in the white car, but did not pull either on the driver. He explained that the guns had been in his boots. He stated that, when he got in the car, "[s]he asked me don't hurt her. I said I ain't gone [sic] hurt you lady, all I want to do is git [sic] away. Not gone [sic] hurt you." [The Petitioner] insisted that he then put the driver out on the highway and that when he left, "that girl was

-6-

standing right there in that gravel road. I didn't harm that girl." [The Petitioner] acknowledged having obtained the 9 mm. pistol from the Bronco.

Lieutenant Gerald Blum with the Memphis Police Department testified that he had been assigned to investigate the victim's disappearance. He initially questioned [the Petitioner] on November 30, 1999. During that interview, [the Petitioner] told Lt. Blum that "he was at an address in Midtown on the street, and he approached a white car." [The Petitioner] told Lt. Blum that he got in the car and forced the female driver to drive around the city until they traveled down Highway 64, at which time he released the driver and kept the car. When Lt. Blum asked [the Petitioner] what he should tell the victim's family, [the Petitioner] said, "Tell them I'm not the one that hurt her." [The Petitioner] then paused and added, "Well, if she's hurt."

Also reporting to the scene where Ms. Johnson's car was found was Federal Bureau of Investigation Special Agent C.M. Sturgis, who began investigating the victim's disappearance when it developed into "more than a missing person" case. Agent Sturgis testified that no blood was found in Ms. Johnson's car. In the abandoned house behind which the victim's car was found, officers found a woman's jacket, which was subsequently identified by Ms. McPike as belonging to the victim. Found a short distance away from the house was a plastic shopping bag bearing the Seessel's supermarket logo.

Frustrated at not having discovered Ms. Johnson's whereabouts by early December, Agent Sturgis traveled on December 3, 1999, to the jail in Oxford, Mississippi, where [the Petitioner] was in custody. Accompanying him was Special Agent Joseph Rinehart. The two agents spent several hours with [the Petitioner], sitting together in the common area of the jail and watching television. Agent Sturgis testified that the three of them "talked about everything under the sun" and watched a football game. At one point, Agent Sturgis showed [the Petitioner] several photographs of Ms. Johnson as a child and in family settings. Agent Sturgis explained that it would be a good thing if the family could resolve her whereabouts before

Christmas. Some time after this, [the Petitioner] tapped Agent Sturgis on the chest and told him he was going to give him something. [The Petitioner] took the envelope in which the photographs had been kept and drew a map on it. [The Petitioner] described an area to Agent Sturgis and told him that, next to an agricultural fuel tank in this area, "under two pieces of tin, you will find what you're looking for."

Agents Sturgis and Rinehart spent the next couple of hours attempting to communicate by telephone to other law enforcement officers the location of the area described to them by [the Petitioner]. Because of the difficulty in describing the exact location, the field officers were unsuccessful in finding the spot described by [the Petitioner]. [The Petitioner] offered several times to take Agents Sturgis and Rinehart to the location if they would put him in a car. Eventually, [the Petitioner] was allowed to leave the jail in Sheriff Buddy East's car. Taking directions from [the Petitioner], Sheriff East, accompanied by Agent Rinehart, traveled to a remote and rural location in Fayette County, Tennessee. Agent Sturgis and Lt. Shaw followed in a second car. Upon arriving at the location described by [the Petitioner], and after following [the Petitioner's] directions, the men found Ms. Johnson's body under two pieces of tin next to an old agricultural fuel tank. At this point, Agent Sturgis testified, [the Petitioner] "started crying." [The Petitioner] was then returned to the Oxford, Mississippi, jail by Sheriff East.

Lt. Gerald Blum with the Memphis Police Department took a statement from [the Petitioner] on December 4, 1999. This statement was tape recorded and subsequently transcribed. The audio tape was played for the jury and copies of the transcript provided to it. In this statement, [the Petitioner] admitted that he was responsible for Ms. Johnson's death. He stated that Ms. Johnson had "come out behind the [car] seat" with a knife and that he "grabbed her arm and took it away from her." This occurred "[w]hen [they] got out the car up there in the woods." He stated that they "fought" and that he had to use force to disarm Ms. Johnson. [The Petitioner] denied having been hurt during the fight but acknowledged that Ms. Johnson

"got cut." He did not, however, remember stabbing her. After their fight, he "put her under some tin" after dragging her twenty yards. [The Petitioner] stated that the victim was "tryin' to move" as he dragged her, but he did not know if she was dead or alive after he placed her under the tin. [The Petitioner] stated that he decided to reveal the victim's whereabouts because he "wanted her to be with her family for Christmas and get this over with. It was eating [him] up. It was eating [him] alive."

Dr. O.C. Smith testified that he performed an autopsy on the victim. X-rays indicated a "retained knife blade present in her left chest cavity." The knife had entered the victim's upper left back and penetrated the victim's lung and aorta. The knife wound caused the victim's death within "[a] matter of minutes." Dr. Smith also testified that the victim had bruises along the line of her left jaw, near her right eye, on the right side of her neck, and on the back of her right thigh. The injuries causing these bruises preceded the victim's death by an hour or two.

[The Petitioner] presented no proof at the guilt phase of his trial.

Upon the conclusion of proof, the jury convicted [the Petitioner] of theft under $10,000, especially aggravated kidnapping, and first degree premeditated murder.

. . . .

Prior to the State adducing any testimony during the penalty phase of [the Petitioner's] trial, the trial court heard the proposed testimony of Dr. Ronald Sundstrom and Ms. McPike in a jury-out hearing. Dr. Sundstrom is a professor of philosophy at the University of Memphis and employed the victim as his teaching assistant. Dr. Sundstrom described the effect of the victim's murder on himself, his undergraduate students, his graduate students, and the philosophy department as a whole. Ms. McPike is the victim's mother. She described the effect of the victim's murder on her family and the victim's friends. The trial court found that this proposed testimony was "basically related to the emotional and psychological impact that

-9-

it's had on the family and friends and colleagues" and ruled that the probative value of this evidence outweighed its prejudicial effect. Accordingly, the trial court determined this testimony was admissible.

Thereafter, with the jury returned to the courtroom, Dr. Sundstrom testified that the victim had been his teaching assistant while a graduate student at the school. She began working for him in August 1999. As one of his teaching assistants, the victim mentored sixty of his one hundred eighty students, grading their papers, teaching some discussion sessions, and counseling them about their coursework. Prior to her death, the victim had met with these students six times. Dr. Sundstrom testified about the impact of the victim's disappearance and death on the philosophy department:

> Well, the impact was tremendous. It's hard to quantify. The psychological impact–the every-day-life impact was tremendous on [the students she mentored, her associate graduate students, and the faculty]. The undergraduates whom she taught w[ere] very afraid that, you know, the course wasn't going to go on. They were traumatized-someone they knew intimately was murdered in this way.

> . . . .

> Many of them couldn't finish–many of them could not go on. Many of them could not complete their papers. It was very difficult for the undergraduates. I had a number of undergraduates approach me, and you know, who was caring for the undergraduates? There were so many of them to care for. Some would approach me in tears about this. It was very difficult for them, and unfortunately I didn't have the ability to care for them. There were too many of them.

> The same with these graduate students.

-10-

. . . .

[T]he whole department ground to a halt. The students did not turn in their papers. Teachers did not teach. Life just didn't go on as we watched the news and as we waited for her to come back.

. . . .

Numbers of the other faculty, including myself, could not teach. We just couldn't teach, you know, under those circumstances. Our lives were devastated. Everything, again, ground to a halt. There was little to no activity around, you know, this education that we're supposed to be providing to everybody.

The graduate students themselves were severely affected because, you know, this was their program. They hoped to be–to get master degrees or Ph.D.'s in philosophy, and many of them just couldn't finish classes–couldn't turn in papers.

Dr. Sundstrom testified that he believed one of the graduate students left "because of this." Other graduate students were unable to complete their coursework and received "incompletes." Some of the graduate students were not able to complete these courses later, resulting in the "incomplete" grades becoming "F's." Dr. Sundstrom testified that, for these students, "their future is very much in question as professors of philosophy." Dr. Sundstrom continued: "the structure of an academic department was brought to a complete standstill, and we just huddled together and cried. That was it. That's all we could do."

Nancy McPike, the victim's mother, testified that the victim's death "never, ever leaves" her family. She testified about the difficulties the victim's younger brother had doing his schoolwork in sixth and seventh grades. She testified about her

husband's inability to start new projects. Ms. McPike herself had been unable to complete her graduate school coursework. Ms. McPike's mother, the victim's grandmother, "cries" and "doesn't understand."

Ms. McPike explained that the victim's best friend had had an argument with the victim just before the kidnapping. Ms. McPike testified that "[t]hey can never make up" and that the friend has "been in therapy ever since. She had herself admitted to a hospital because she was afraid she would take her own life because of this." Ms. McPike continued:

> You know, I told you everyone loved Hillary. Everyone just loved her right away. She has a whole army of friends out here who came to witness this. She has friends all over the world who will never have her again. She was such a great friend, and it makes you sick to your stomach. Sometimes when I think that she's dead, I just can't breathe anymore. When I saw her picture-this beautiful picture, I could hardly breathe.
>
> . . . .
>
> It's devastating. It's devastating. I don't know what it means for her to be dead and for me to be alive. I just don't know what it means.

Joe Warren, an employee in the Criminal Court Clerk's Office in Shelby County, Tennessee, testified that [the Petitioner] was convicted in Shelby County in 1974 of three counts of robbery with a deadly weapon and one count of rape.

Mary Alice Busby, the Circuit Court Clerk in Lafayette County, Mississippi, testified that [the Petitioner] was convicted in 2001 in Mississippi of kidnapping and manslaughter. Concerning this kidnapping conviction, James Allen Nault of Oxford, Mississippi, testified that, on November 15, 1999, he saw [the Petitioner] trying to kidnap his wife. Mr. Nault

approached [the Petitioner], at which time [the Petitioner] pointed a shotgun at him. Mr. Nault told [the Petitioner] to take him instead of his wife, and [the Petitioner] agreed. They got into Mr. Nault's car with Mr. Nault driving and [the Petitioner] keeping the gun pointed at Mr. Nault. While they drove, [the Petitioner] threatened to kill several people that Mr. Nault knew. At [the Petitioner's] direction, Mr. Nault drove them down a gravel road. [The Petitioner] got out and walked off into the woods.

Concerning the Mississippi manslaughter conviction, Sheriff Buddy East testified that he began looking for [the Petitioner] after hearing of Mr. Nault's kidnapping. He sent investigators to the residence of Mr. William Bramlett, one of the persons [the Petitioner] had threatened while talking to Mr. Nault. These law enforcement persons located Mr. Bramlett and warned him about [the Petitioner]. They continued looking for [the Petitioner] but were unable to locate him. The next morning, November 16, 1999, Mr. Bramlett was reported missing. Mr. Bramlett's vehicle was not at his residence. Sheriff East put out an alert for Mr. Bramlett and his pick-up truck. Officers walked through Mr. Bramlett's residence but did not find him. The next day, a family member found Mr. Bramlett's body in his home, hidden under a mattress. Mr. Bramlett had been shot with a .22 caliber pistol. Law enforcement then released information through the media in an effort to apprehend [the Petitioner]. The information indicated that [the Petitioner] was wanted for capital murder. Sheriff East testified that Mr. Bramlett's truck was eventually found two or three miles from Jessie Cochran's house.

As its final piece of evidence during the penalty phase of [the Petitioner's] trial, the State submitted certified records from Alabama reflecting [the Petitioner's] 1982 conviction of robbery in the first degree.

[The Petitioner] put on no proof.

Young, 196 S.W.3d at 94-101 (footnotes omitted).

-13-

## POST-CONVICTION PROCEEDINGS

At the post-conviction hearing, Co-Counsel testified that she joined the Shelby County Public Defender's Office in June 1990 and was on the capital case team from September 1998 until June 2004. She was assigned to the Petitioner's case in March 2002, and the case went to trial in August 2002. Co-Counsel did not know why the case went to trial so quickly. She said that a trial in a capital case typically required more than five months to prepare.

Co-Counsel testified that in March 2002, the capital case team was comprised of her as the full-time attorney; two part-time attorneys; the investigator, Ralph Nally; and mitigation specialists, Elizabeth Benson and Joyce King. Both part-time attorneys also maintained private law practices. The capital case team generally began its representation of a defendant at arraignment in the general sessions court and continued through the end of trial if the State sought the death penalty. If no death notice was filed, the case would be reassigned to counsel outside the capital case team. Co-Counsel said that at times, she had twenty cases or more; however, death notices had not been filed on all of them. Of those twenty or more cases, six or more were capital cases, and three to six were set for trial in an eighteen-month period.

Co-Counsel said that she was team coordinator and that she assigned cases. The entire team held monthly meetings during which they discussed their cases and any legal issues involved. Co-Counsel assigned the Petitioner's case to Lead Counsel because he was next in the rotation and likely did not have as many trials scheduled as the other attorneys on the capital case team. She assigned Mr. Nally to the Petitioner's case as the investigator and Ms. Benson as the mitigation specialist.

Co-Counsel testified that the capital case team held an intake meeting with the Petitioner on March 15, 2002, at 9:30 a.m. An intake meeting typically lasted one and one-half to two hours. She recalled that during the Petitioner's intake meeting, the Petitioner told the defense team members that they could not do anything for him and refused to talk to them. As a result, the meeting likely lasted less than one hour. The intake meeting was not completed, and Co-Counsel did not know if any information was actually gathered during the meeting. She acknowledged that written on the intake sheet was a notation that the Petitioner had grown up in Tate County and a reminder to contact someone in Oxford, Mississippi. Following the initial visit with the Petitioner, Co-Counsel did not visit him again alone and did not recall whether she visited him with Lead Counsel the week before trial.

Co-Counsel testified that Lead Counsel continued to meet with the Petitioner throughout their representation and was able to establish a rapport with him. Co-Counsel did not know whether they had sufficient time prior to trial to investigate the information that

-14-

Lead Counsel received from the Petitioner. She believed that Lead Counsel requested a continuance in order to obtain additional information from the Petitioner.

Co-Counsel said that to determine whether to have a client undergo a mental health evaluation, she examined the client's appearance, the allegations, and any history of mental health issues. She acknowledged that a client's lack of cooperation was a "possible" sign of mental illness and that repeated suicide attempts could indicate mental heath issues.

Co-Counsel acknowledged that if a client had been in a mental institution or had been evaluated in a particular facility, she attempted to obtain those records. She stated that listed on the Petitioner's intake form was a prior hospitalization of the Petitioner at Central State in Nashville, but she maintained that she did not know whether Ms. Benson obtained this information during or after the intake meeting. Another notation on the intake form indicated that the Petitioner was taking medication but did not indicate the type of medication. Co-Counsel said that she wanted to obtain the Petitioner's records from Columbia Training Academy in Mississippi and his prison records to see if he had any medical or psychological treatment while in prison.

Co-Counsel testified that Ms. Benson contacted the Petitioner's family members but that most of them were uncooperative or did not return her calls. The relatives had severed ties with the Petitioner several years prior. Co-Counsel recalled abuse in the family, as well as allegations that the Petitioner had raped at least one of his sisters. Co-Counsel was unaware that the Petitioner's family had a reunion at Jessie Cochran's home before the Petitioner was incarcerated in Mississippi.

Co-Counsel identified a facsimile from Garry Mooers, an associate professor in the Department of Social Work at the University of Mississippi, that was sent to Ms. Benson on July 15, 2012, approximately one month prior to trial. Co-Counsel believed that Dr. Mooers may have been involved in the mitigation aspect of the Petitioner's murder case in Mississippi. In the letter, Dr. Mooers stated that the Petitioner was difficult and had chased Dr. Mooers out of the room twice before the Petitioner agreed to meet with him. Dr. Mooers also stated that the Petitioner had signed release forms for him and that Dr. Mooers was willing to visit the Petitioner to persuade him to sign the forms for the defense team. Co-Counsel was unaware of any efforts made by Ms. Benson to contact Dr. Mooers and to arrange for him to visit the Petitioner. Further, in the letter Dr. Mooers stated that the Petitioner was very paranoid about those he believed were working against him, including defense attorneys and others who were actually attempting to assist him. Dr. Mooers listed information about the Petitioner's family and described his childhood.

Co-Counsel acknowledged that according to Dr. Mooers, the Petitioner had been

beaten unconscious with a frying pan as a child. Additionally, the Petitioner told Dr. Mooers that he was knocked unconscious while imprisoned at Parchman, as the result of a automobile accident, and while in Collierville, Tennessee. Co-Counsel said that prison records from Parchman could have verified the Petitioner's head injury but that she was unaware of whether the defense had received those records. She stated that multiple head injuries could be a "red flag" that a mental evaluation may be necessary. In the letter, Dr. Mooers said that the Petitioner had wanted to undergo a mental evaluation because he believed something was wrong with him. Co-Counsel said that "[s]ometimes people do that as a smoke screen just to buy time. Sometimes it's genuine, . . . you never know."

Co-Counsel did not recall when she received discovery from the State. She said that the discovery materials should have been given to Lead Counsel, who would have made copies for the other members of the defense team. Co-Counsel identified the statement that Virginia Davis, the Petitioner's niece, had given to the police. Co-Counsel was unaware of whether Ms. Davis was interviewed by any member of the defense team. She said Lead Counsel would have directed which witnesses were to be interviewed.

Co-Counsel testified that Lead Counsel generally examined all witnesses who testified during both phases of the trial. Lead Counsel usually asked the "second chair" to act as the liaison with the client's family to explain the proceedings and to contact them to ensure the client would have proper clothing for trial. Co-Counsel said she did not perform this function in the Petitioner's case, however, because none of his family members were involved in the case. Co-Counsel took notes during the Petitioner's trial but did not question any witnesses. Lead Counsel filed the motion to suppress, and Co-Counsel probably did not attend the hearing on the motion. Co-Counsel did not recall challenging the lawfulness of the Petitioner's arrest in Tennessee by officers with the Mississippi Highway Patrol.

Co-Counsel said that Lead Counsel never asked her to complete any tasks with regard to the case. She explained,

> We would discuss the case, obviously. But, as far as me doing anything with any witnesses or anything like that, no. I had nothing to do with that. But, as far as during the trial, also, when he cross-examined witnesses he would ask me if there's anything else to ask. So, as far as that. But, as far as me just handling any trial work or any mitigation work, any sentencing work, no.

Co-Counsel did not direct any investigation tasks to be completed regarding issues relevant to either the guilt or penalty phase. She also did not have any discussions with the State

regarding a possible plea agreement.

Co-Counsel believed that at trial, the defense raised a venue issue concerning whether the murder actually occurred in Shelby County. She did not know why the defense team did not request a special jury instruction on venue. She said, "I don't know that [venue] was the defense. . . . [I]n a lot of capital trials I don't know that a guilt phase defense is something you always have the luxury of. And, this was probably one of those cases."

Co-Counsel acknowledged that the case had received publicity and that counsel expressed concern about publicity in the motion to continue. She also acknowledged that a jury questionnaire would have assisted the defense team in identifying in advance those jurors who had heard about the case. However, she stated that she had never used a jury questionnaire. Co-Counsel testified that Lead Counsel conducted voir dire and that she was not involved in the preparation of voir dire other than the utilization of her experience in other cases. While she did not know why the defense team failed to request individual sequestered voir dire, she believed that the trial judge never allowed it.

On cross-examination, Co-Counsel testified that the murder occurred in 1999 and that the trial was held in 2002. Between 1999 and 2002, the Petitioner was incarcerated in Mississippi "awaiting trial on a homicide," and he eventually pled guilty to voluntary manslaughter. Following the disposition of the charge in Mississippi, the Petitioner was transferred to Tennessee for trial.

Co-Counsel said Lead Counsel represented a number of capital defendants and had his own way of approaching a case. At the time of the Petitioner's trial, none of Lead Counsel's clients were on death row. The defense team discussed the case, including any legal issues that arose, while the case was pending. Co-Counsel stated that the case was difficult to defend and that the State's evidence was "pretty clear cut." She said that they had to rely on the Petitioner for any defenses but that he initially refused to cooperate. Co-Counsel did not know at what point the Petitioner began to communicate with Lead Counsel.

Co-Counsel testified that she was not aware the Petitioner had received a previous mental health diagnosis. She said that the Petitioner's head injuries "might have been enough to get some type of psychiatric testing done" but that she did not recall whether she was aware of the prior head injuries. Co-Counsel said that while Dr. Mooers had mentioned the prior head injuries in his letter, she did not see any indication that the Petitioner had a mental health issue. She stated that "granted I didn't see him often but it didn't appear as if there w[ere] any cognitive problems. I mean, there w[ere] no complaints about headaches or anything like that or blackouts which are not uncommon with head injuries, that kind of thing. I don't recall any information about that." Co-Counsel was unaware of whether the

Petitioner provided Lead Counsel with any such information.

On redirect examination, Co-Counsel testified that she made no efforts to establish a rapport with the Petitioner following the initial meeting. She stated that regardless of the Petitioner's cooperation, information from records could have been used to establish particularized need for an evaluation. She acknowledged that particularized need could have possibly been established through records showing a prior diagnosis of mental illness in 1972 by two doctors. Counsel also could have used information obtained from Dr. Mooers regarding the Petitioner's prior head injuries to seek funding for an evaluation. Additionally, evidence presented during the suppression hearing that the Petitioner told the police that he had experienced a blackout could have been used as a basis to request an evaluation. Co-Counsel acknowledged that jail or prison records indicating head injuries or suicide attempts would have raised a "red flag" regarding the need for an evaluation and could have been available without the Petitioner's cooperation.

Lead Counsel testified that he had alternated between private practice and the Shelby County Public Defender's Office from 1981 until around 2005 to 2007. In 1999, he worked part-time as an assistant public defender in the capital case division. During his career, he had tried twelve to fifteen capital cases. At the time of the Petitioner's trial, Lead Counsel also had a private law practice that was not "much of a private practice" due to the number of capital defendants that he represented with the public defender's office.

Lead Counsel said that the entire capital defense team held meetings on a regular basis, during which each member reported on their individual cases. As a result, every member of the capital case team knew the progress of each capital case.

Lead Counsel testified that it was important to build a relationship with a client in a capital case, maintaining that without that relationship, counsel could not obtain necessary information from the client. He opined that visiting a client could help build trust so that the client would share information.

Lead Counsel testified that during his initial interview with the Petitioner on March 15, 2012, the Petitioner was not cooperative and refused to talk to the defense team. The Petitioner stated he knew that the State was going to put him to death. Lead Counsel did not know when he next visited the Petitioner at the jail. He acknowledged that he did not visit the Petitioner at the jail "a lot of times" and that they met more during court appearances. Lead Counsel said that in terms of a capital case, he had only a short period to prepare from the time of his assignment to the case in March 2002 to the time of trial in August 2002. He said that such a short period of time made it more difficult to persuade difficult clients and reluctant family members to cooperate.

Lead Counsel identified his notes from the March 15, 2012 meeting with the Petitioner. According to the notes, the Petitioner informed Lead Counsel that Bill Link had represented the Petitioner on the appeal of his conviction in Mississippi and that David Bell had represented him at trial. The Petitioner told Lead Counsel that he was taking Dilantin, which Lead Counsel believed to be a "downer" or was used to control seizures. Lead Counsel acknowledged that the Petitioner provided him with information about his background during the meeting. Lead Counsel's notes indicated that he questioned whether to have a mental evaluation performed on the Petitioner.

Lead Counsel said the Petitioner subsequently "open[ed] up" to him and provided him with information. The Petitioner informed him of his enrollment at Columbia Boarding School or Columbia Reform School in Mississippi and of the abuse that he endured as a child. The Petitioner told Lead Counsel that the individuals at Columbia who were aware of the abuse were deceased. Lead Counsel said that as a result, there was no evidence to substantiate the abuse; however, Lead Counsel subsequently learned that the school had closed due to the abuse that had occurred there. Lead Counsel was unaware that the Petitioner's brother, John Young, attended the school during the same time period as the Petitioner. Lead Counsel acknowledged that Mr. Young could have been able to verify the information that the Petitioner provided about the abuse, but Lead Counsel did not know what efforts were made to locate Mr. Young.

Lead Counsel stated that a person with mental health issues resulting from abuse as a child might need to undergo a mental evaluation. Virginia Reed, the Petitioner's sister, told Lead Counsel that the Petitioner had been abused by his father. Lead Counsel acknowledged that on the Petitioner's intake interview form was a notation that the Petitioner had received treatment at Central State in Nashville. Lead Counsel did not recall instructing Ms. Benson to obtain the Petitioner's records from Central State. While Lead Counsel reviewed the Petitioner's institutional histories, he did not know from where he received the records. Any records that were gathered would have been done so by Mr. Nally or Ms. Benson. Lead Counsel believed he also spoke with Dr. Mooers.

Lead Counsel testified that while he was aware of the Petitioner's prior convictions, he did not review the court jackets from those convictions. He was unaware that the case jacket for the Petitioner's prior aggravated robbery conviction, which had been used as an enhancement factor, included a letter from two doctors in 1972, declaring the Petitioner to be mentally ill. Lead Counsel said that whether the letter established that the Petitioner had a history of mental illness was "questionable." He explained, "[T]hat's 1972, this [wa]s '99 and you go back from a standpoint of interviewing the client, talking to the client, if the client is able to communicate in all this, I mean why would you need anything about mental health and he's not mentally ill, he's not crazy."

Lead Counsel stated that if, during meetings with a client, he saw signs that a mental evaluation was necessary, he had an evaluation performed. However, he did not have clients evaluated if they were able to communicate with him and understand the proceedings. Lead Counsel explained, "[I]f he's able to talk I don't have them evaluated. There's no reason to. He can convey the information directly to me as to whether or not he thinks he's got some mental issues that we can look at, then go back and look at. But, just to get him evaluated just because, I think it's wrong." Lead Counsel stated that Dr. Mooers's letter dated July 15, 2002, did not lead him to believe that a mental evaluation of the Petitioner was necessary. Lead Counsel did not agree that the Petitioner's prior head injuries resulting in unconsciousness would establish particularized need for funds for a mental health evaluation. According to Lead Counsel,

> [i]f he was able to communicate, mental competency is an issue that we deal with very frequently. If he's able to respond, he's talking to me, we've got stuff going on and he's able to comply, he knows what's going on. Like I say, then, I'm not going to go out and have him evaluated for mental competency when I know he's competent.

He acknowledged that he possibly could have used the results of a mental evaluation to determine whether the Petitioner had organic brain damage or other psychological problems in order to explain the Petitioner's actions to the jury.

Once the Petitioner began cooperating, Lead Counsel did not send Ms. Benson back to the jail to have the Petitioner sign releases so that she could obtain his records. While Lead Counsel acknowledged that obtaining medical and psychological records normally would have been part of a mitigation investigation in a capital case, the Petitioner only started opening up and cooperating in July 2002, approximately one month before trial.

Lead Counsel testified that he filed a motion to continue the trial due to unresolved constitutional and jurisdictional issues. He had filed a petition for writ of habeas corpus in federal court and had included this information in his motion to continue. The trial court denied the motion. Lead Counsel said that due to the publicity surrounding the case, the trial judge "pushed" to try the case quickly. Lead Counsel later identified his motion to continue and said that the only ground included in the motion was the "pre-trial publicity on the morning of the trial." He acknowledged that he could have included the need for additional time to complete an investigation into the Petitioner's background as another ground for a continuance.

Lead Counsel considered filing a motion for change of venue due to the publicity

involved. He believed, however, that the better course was to file a motion to continue based upon the publicity. After the trial court denied his request for a continuance, he did not file a motion for change of venue.

Lead Counsel said he interviewed several fact witnesses. Although he did not have notes from any of the interviews, he recalled speaking with the witnesses, including Jessie Cochran. He also questioned the witnesses who testified during the suppression hearing. Lead Counsel acknowledged that there was no defense theory in the guilt phase of the trial.

Lead Counsel recalled an issue of whether the murder occurred in Fayette County or Shelby County. He filed a petition for writ of habeas corpus in federal court, asserting that there was no jurisdiction to try the Petitioner in Shelby County. He did not present lack of venue as a defense at trial or request a special venue instruction.

Lead Counsel testified he did not challenge the lawfulness of the Petitioner's arrest by Mississippi Highway Patrol officers in Hardeman County, Tennessee. He believed that officers from Hardeman County had also participated in the Petitioner's arrest.

Lead Counsel testified he had discussions with the Petitioner throughout the proceedings about whether he wanted to testify. They reviewed the questions that Lead Counsel believed the prosecutor would ask the Petitioner. Lead Counsel believed that the Petitioner decided early in the case that he would not testify.

On cross-examination, Lead Counsel described the evidence of guilt as "overwhelming." The victim was stabbed, and the blade was broken off in her body. The Petitioner gave a statement admitting to killing the victim and took officers to the location of the victim's body. The Petitioner did not provide Lead Counsel with any information to counter the State's case. Lead Counsel testified that based upon the information that he received, he believed no defense was available. He said that the Petitioner knew this and told Lead Counsel that there was nothing he could do to help the Petitioner.

Lead Counsel testified that while the Petitioner initially provided "bits and pieces" about his life, he was not cooperative. The Petitioner did not begin to cooperate and provide additional information until the end of July of 2002, just prior to the trial in August. The Petitioner said no school records existed because he worked six days a week on his family's farm. He reported abuse while enrolled in Columbia but said that those who knew of the abuse were deceased. Lead Counsel said no school records of the Petitioner's time at Columbia existed. The Petitioner's family members also refused to cooperate.

Lead Counsel stated that he was able to develop a rapport with the Petitioner over

time. While Lead Counsel did not visit the Petitioner at the jail often, he met with him in a private room in the lock up area following their court appearances. Lead Counsel also discussed the case with the Petitioner during the trial. He said, "It was ongoing communication between me and him during voir dire, during the cross-examination, the State's proof, the whole nine yards we talked the whole time."

Lead Counsel said that the Petitioner never told him that he had suffered multiple head injuries and that he saw no indication that the Petitioner suffered from a brain injury. Lead Counsel said that the Petitioner was not incompetent and that he saw no reason to have the Petitioner undergo a mental evaluation. Lead Counsel acknowledged that the Petitioner was hospitalized for a time at Central State, a mental health facility in Nashville.

Lead Counsel testified that while the offense occurred in 1999, the Petitioner was not arraigned until March 2002. For a period of time, the Petitioner was in jail in Mississippi awaiting prosecution for murdering a relative. After the Petitioner entered a plea, he was sentenced to Parchman Penitentiary in Mississippi. He was then transferred to Tennessee for prosecution. Lead Counsel said he spoke to the Petitioner's attorneys in Mississippi "a couple" of times.

Lead Counsel testified his caseload was not such that he could not spend the time required to prepare for the trial. He believed that he was prepared for both the guilt and penalty phases when he went to trial.

Ralph Nally, a criminal investigator with the Shelby County Public Defender's Office, began investigating capital murder cases in 1981. He did not recall his case load at the time of the Petitioner's case. Mr. Nally testified he was notified "through paper" of his assignment to the Petitioner's case and of the time the defense team would meet with the Petitioner. During the meeting, each member of the defense team introduced themselves to the Petitioner and gave a brief synopsis of their tasks and what they hoped to accomplish. According to Mr. Nally, the Petitioner said "something to the effect that you can't help me anyway, so, there's not much point in having this meeting."

Mr. Nally testified that he waited for instructions from Lead Counsel before conducting any investigation. Lead Counsel did not give Mr. Nally any specific instructions following the initial meeting with the Petitioner but kept him apprised of counsel's communication with the Petitioner. Mr. Nally did not recall receiving the discovery materials in the Petitioner's case. Typically, after receiving discovery Mr. Nally reviewed the materials and interviewed witnesses. Mr. Nally did not interview Jessie Cochran, Richard Rice, Virginia Davis, Catherine Crane, Nancy McHite, Michelle Naef, Kyatonie Jones, Jeffrey Herberson, Darrin Goods, Rick Marlar, Buddy East, David Shaw, or Siam Sturgis. Mr. Nally

did not recall Lead Counsel instructing him to interview any of these witnesses.

Mr. Nally said that the Petitioner told the defense team in the initial meeting that he had "cases" in Mississippi and that he did not feel that they could help him at that point. The Petitioner did not provide them with the names of the people and attorneys involved in the cases. Mr. Nally was not aware of and did not investigate any issues involving extradition. Lead Counsel did not instruct Mr. Nally to speak to Mr. Walls, who represented the Petitioner in Mississippi; any officers who took the Petitioner's statements; or any officers the Petitioner led to the victim's body.

Mr. Nally testified that the defense team met on a regular basis but that he could not recall the number of meetings they had during which they specifically discussed the Petitioner's case. Lead Counsel never informed Mr. Nally of the theory of defense. Mr. Nally explained that he did not obtain any information about the case in addition to the discovery provided by the State because Lead Counsel never instructed him to obtain additional information.

Mr. Nally said that on July 31, 2002, he, counsel, and Ms. Benson met with the Petitioner at the jail. During that meeting, they discussed the facts and the Petitioner's family history. The information that the Petitioner provided included his educational history, family history, and history of abuse. Mr. Nally stated that he did not attempt to gather additional information following the meeting because there was nothing requiring further investigation.

On cross-examination, Mr. Nally testified that he relied on the Petitioner to identify witnesses or information to investigate. The Petitioner, however, did not provide any such information. The first time the Petitioner discussed his background with Mr. Nally was during the July 31, 2002 meeting.

Mr. Nally stated that Lead Counsel provided him with a copy of the discovery provided by the State. The defense team discussed the case two or three times and visited the Petitioner at the jail during the initial intake meeting and on July 31. Mr. Nally never met with the Petitioner alone to discuss the case.

Elizabeth Benson, the mitigation investigator, testified that she attended the intake meeting with the Petitioner on March 15, 2002, along with counsel and Mr. Nally. She said that during the intake meeting, the Petitioner was uncooperative and refused to provide any information. She acknowledged that the intake form she generally used included information she received from either the Petitioner, Lead Counsel, or the Petitioner's counsel in Mississippi. Ms. Benson acknowledged that she noted on the intake form that the Petitioner was taking "psych meds" and had previously received treatment at Central State, a mental

health facility. Lead Counsel did not instruct her to obtain the records from this facility. Ms. Benson said that she interviewed Virginia Dyer, a relative of the Petitioner, who stated that the Petitioner had a "split personality," that some family members were afraid of him, and that he should remain in jail.

Ms. Benson stated that she waited for directions from Lead Counsel before completing any tasks related to mitigation. She was not directed to obtain the Petitioner's prison or jail records, educational records, or juvenile records. Ms. Benson testified that during the intake meeting, the Petitioner refused to sign release forms allowing Ms. Benson to obtain his records. She did not return to visit the Petitioner until the entire defense team met with him at the end of July 2002. She acknowledged that records could have been obtained through means other than a signed release, such as a court order or subpoena.

Ms. Benson testified that Lead Counsel informed her of Dr. Mooers, who had been the mitigation specialist in the Petitioner's case in Mississippi. On March 25, 2002, Ms. Benson spoke to Dr. Mooers, who stated that he would send her all the information he had regarding the Petitioner. When Ms. Benson did not receive the information, she left messages for Dr. Mooers on April 15, April 22, and April 25. On June 14, she informed Lead Counsel of her failed efforts to contact Dr. Mooers, and Lead Counsel told her that he would try to contact him. Between March 2002 and June 2002, Ms. Benson did not receive any records from Dr. Mooers, nor had she obtained records of the Petitioner from other sources. On July 15, approximately one month prior to trial, Ms. Benson received a facsimile from Dr. Mooers in which he offered his assistance in communicating with the Petitioner. Dr. Mooers's letter listed the Petitioner's family members and outlined his family history. Ms. Benson did not receive any records from Dr. Mooers.

Ms. Benson said that during her initial conversation with Dr. Mooers on March 25, she noted that the Petitioner had attended Columbia Training Center in Columbus, Mississippi. She was unable to issue subpoenas for those records because the Petitioner did not sign the releases. On July 16, 2002, Ms. Benson contacted Columbia Training Center and was advised that she needed a court order to obtain the records. Ms. Benson informed Lead Counsel of the conversation, but Lead Counsel never obtained a court order. Ms. Benson was aware that the Petitioner had been incarcerated in Mississippi in Parchman, in the Marshall County Department of Correction, and in Desoto County, but she did not attempt to obtain his prison records.

On cross-examination, Ms. Benson testified that the Petitioner's refusal to cooperate disadvantaged her investigation. She said Lead Counsel would have informed her of any information the Petitioner revealed about his background. However, the Petitioner did not discuss his background until the team meeting at the end of July 2002.

-24-

Ms. Benson stated that Lead Counsel provided her with an intake report from the Department of Correction in Mississippi that included the Petitioner's family, criminal, and medical history. The form stated that there was no family history of mental illness or mental health problems. Ms. Benson saw no indication that the Petitioner was suffering from a mental disease or defect or was not competent to proceed. On redirect examination, Ms. Benson acknowledged that she was aware that the Petitioner's brother, John, had been in and out of mental hospitals since he was a teenager.

Ron Lax, a private investigator with Inquisitor, Incorporated, testified that he had been a private investigator for thirty-nine years and had worked in the area of capital defense since 1988. He had investigated approximately 300 capital cases in his career. Mr. Lax testified that he may have had fifteen to twenty capital cases in different stages in his office at one time. He said that most cases lasted eighteen months to two years. Mr. Lax stated that under state law, he and his investigators were required to attend continuing education seminars every year. He and the other investigators had attended various capital case seminars.

Mr. Lax testified regarding his attempts to establish trust with his clients. Most of his clients had dysfunctional backgrounds and experience in the criminal justice system. Mr. Lax explained that as a result, the clients "ha[d] learned how to put up a front where they don't let their guards down. They're not going to trust us on the front end, they never do." He said that to establish a relationship with his clients, he never lied to them. His clients generally had their own theories and ideas about what areas should be investigated. Mr. Lax found that if he complied with the clients' requests and returned to them with results, "it ha[d] a lot of effect because they realize then they've got somebody they can actually talk to that listens to them." Mr. Lax stated that such trust did not occur in four or five visits.

Mr. Lax testified that he rarely conducted an interview with a witness over the telephone due to the difficulty in developing a rapport with a witness. If a witness did not want to cooperate, he or she could simply hang up the telephone. Mr. Lax said that if the investigator called a witness to arrange a meeting, the witnesses usually changed his or her mind about cooperating by the time of the meeting. Mr. Lax documented each interview because he could not remember the interview absent such documentation.

Mr. Lax testified that after accepting a case, he reviewed the discovery provided by the State to determine the State's theory of the case. He then prepared a synopsis for each witness listed in discovery, a list of police officers and the tasks completed by each officer, and a list of discovery that he believed existed but had not been provided. Mr. Lax prepared a list of investigative tasks that needed to be completed and forwarded the lists to counsel. Next, Mr. Lax visited the crime scene and the client for the first time. He completed the tasks before visiting the client so that he could determine during the meeting the extent to

which the client was lying to him.

Mr. Lax testified that his initial visit with the client did not include the entire defense team because he wanted to develop a rapport with the client by himself. He said the client's behavior toward him would not be the same as it would with counsel present. Mr. Lax did not wait for instructions from counsel before investigating the case. He said that he generally spent 300 to 500 hours investigating the guilt phase aspect of the case and 400 to 600 hours investigating mitigation. Mr. Lax had declined to accept cases when he believed he would be unable to manage his case load and meet the standards required for investigating a capital case.

Mr. Lax testified that he reviewed trial counsel's file and noted that it contained no memoranda or other documentation of any investigation performed relating to the guilt phase. He found five mitigation memoranda, which were approximately one paragraph each, of interviews of family members that were conducted over the telephone. Mr. Lax said the memoranda and lack of other documentation did not constitute acceptable work product in his office and did not meet the community standard required for investigators in a capital case.

Mr. Lax testified that he interviewed Mr. Nally, who recalled that the Petitioner was not cooperative during the initial meeting and told the defense team that it could not help him. Mr. Nally could not recall whether he generated any memoranda and told Mr. Lax that if any memoranda existed, they should be in the file. Mr. Lax reviewed Mr. Nally's testimony from the post-conviction hearing, during which he stated that he generally waited for counsel to provide instruction regarding the specific investigation tasks to complete. Mr. Lax said that in discussing the case with Mr. Nally, he did not learn what instructions, if any, trial counsel provided. Mr. Lax saw no notes or memoranda directing Mr. Lax to complete any task. Mr. Lax said, "I'm not sure how effective an investigator could be for an attorney if he was waiting for the attorney to tell him what to do each step of the way." He did not believe that Mr. Nally's work on the case met the community standards required for an investigator.

On cross-examination, Mr. Lax testified that he did not investigate the Petitioner's case. He said that after reviewing the file, "I would say there was not a lot of leeway on the guilt/innocence part."

Glori Shettles, a mitigation specialist for Inquisitor, Incorporated in Memphis, Tennessee, was admitted by the post-conviction court as an expert in the area of mitigation. Ms. Shettles testified that a thorough mitigation investigation generally took twelve to eighteen months. Her office provided investigative services for fifteen to twenty capital

cases at a time, including both trial and post-conviction cases.

Ms. Shettles testified that when she was first assigned a case, she was not directed when to begin collecting records or which records to collect. She was taught in seminars which records to collect and began collecting the records on her own without instruction. While Ms. Shettles had never worked on a case where the defense team initially met with the client together, she had clients who initially refused to sign releases allowing her to obtain records. In such situations, she met with the client on multiple occasions to explain the need for the records and enlisted the assistance of counsel, a family member, or a girlfriend. Ms. Shettles explained that even if a client refused to sign the releases, counsel could obtain the necessary records through a subpoena or court order. She said a client's refusal to sign releases was not a reason to decide not to pursue the collection of the records.

Ms. Shettles stated that a client might initially refuse to cooperate because of a number of reasons. She explained that the information obtained through interviews or records was difficult for a client to discuss. She also explained that it took time to build rapport so that the client discussed the information.

Ms. Shettles testified that as a mitigation specialist, she searched for "red flags" in records indicating the need for certain types of experts. She said information in the Petitioner's prison and jail records indicated the need for a mental health evaluation. The Petitioner received mental health treatment while housed in Parchman Prison in Mississippi. While he was in jail in Oxford, Mississippi, the Petitioner discussed committing suicide and being depressed. Other prison records referred to the Petitioner's seeking mental health treatment on three or four occasions. Ms. Shettles obtained records from the Petitioner's prior convictions in Shelby County in 1972. The file included a certificate stating that the Petitioner was committed to Central State and that he was declared mentally ill but competent. The Petitioner's records from Central State were not available.

Ms. Shettles believed that a history of alcohol or drug abuse could indicate the need for a mental health evaluation. In determining whether there was a history of drug or alcohol abuse, Ms. Shettles examined the types of drugs or alcohol used, the age the person began using them, and the amount of drugs or alcohol consumed. She said drug or alcohol abuse could affect a person's judgment, behavior, and demeanor and could lead to brain damage or depression.

Ms. Shettles testified that the Petitioner had a history of head injuries that indicated a need for testing by a neuropsychologist or a neurologist. The Petitioner reported that his mother had hit him in the head with a skillet as a child and that he was knocked unconscious. He had also suffered head injuries while in Columbia Training School, while in prison either

at Parchman or in Tennessee, and as the result of an automobile accident.

Ms. Shettles stated that the defense team did not collect any of the Petitioner's records and that she did not see where they made any efforts to obtain the records. In reviewing Ms. Benson's notes, Ms. Shettles did not see that Ms. Benson had ever returned to visit the Petitioner following the initial meeting to have him sign the releases. Ms. Shettles did not see Ms. Benson make any effort to build a relationship with the Petitioner, and such inaction violated the applicable standard of care.

Ms. Shettles said she did not collect any of the Petitioner's records from Columbia Training School. She obtained an acknowledgment and verification that the Petitioner had been enrolled in Columbia but received information that the Petitioner's records had been destroyed. Ms. Shettles had worked on another capital case involving a client, Richard Odom, who had also been enrolled in Columbia. She had reviewed court documents from the United States Justice Department and the State of Mississippi regarding complaints of treatment of residents of the school. A lawsuit was filed in 1975, which referenced problems that had occurred in the past. Ms. Shettles spoke to Richard Odom and his brother, Jimmy Odom, who testified during proceedings involving the treatment Richard Odom had received while a resident of Columbia during the same period of time in which the Petitioner was enrolled. The information she learned from the records and interviews was consistent with the information provided by the Petitioner.

Ms. Shettles testified that she obtained the jail visitation records from the Shelby County Sheriff's Department for the time period prior to the Petitioner's trial. The records showed only two visits from Lead Counsel. The records did not reflect visits from Co-Counsel, Ms. Benson, or Mr. Nally.

Dr. Daniel Malcomb Spica, a clinical and forensic neuropsychologist in Knoxville, Tennessee, was admitted by the post-conviction court as an expert in neuropsychology. Dr. Spica conducted a neuropsychological examination of the Petitioner at the request of post-conviction counsel. He explained that the primary goal of a neuropsychological examination was to assess the functioning of a person's brain in terms of problem solving, attention, memory, language abilities, and how the brain activity results in behavior. He said that while psychology classified a person's sense of behaviors, neuropsychology connected brain functioning with behavior.

Dr. Spica testified that he administered the Wechsler Test of Adult Intelligence and determined that the Petitioner had an I.Q. of 77. He said the Petitioner fell within the borderline range of intellectual functioning and was "fairly close" to being intellectually disabled. He described the disparity between the Petitioner's verbal and non-verbal skills as

"surprising." The Petitioner performed in the "near normal range" in tasks that required physical stimuli and working with his hands. Dr. Spica described the Petitioner's verbal skills as "unusually low" in that he ranked in the first percentile. He testified that the scores led him to believe the Petitioner had some form of brain dysfunction. An I.Q. score of 77 suggested that the Petitioner would be challenged by navigating the problems of daily life and that he would be more challenged by problems requiring verbal and reasoning skills. Dr. Spica stated the Petitioner's I.Q. of 77 was the average of a "mediocre" score in non-verbal skills and a "terrible" score in verbal skills.

Dr. Spica also employed the Barona Formula, which predicts a person's I.Q. based upon the person's demographics, where the person grew up, and the person's employment history, education, age, and gender. Under this formula, the Petitioner's predicted I.Q. was 83, which fell within the low average range but not the borderline range within which the Petitioner's actual I.Q. fell. Dr. Spica said that the reasonable conclusion from the results was that the Petitioner had experienced other problems that caused his I.Q. to be lower. For example, the Petitioner's multiple head injuries that had resulted in loss of consciousness could have contributed to the Petitioner's lower I.Q. Dr. Spica stated that drug and alcohol usage also could affect an I.Q. if the usage was great enough.

Dr. Spica said that testing of the Petitioner's abstract reasoning revealed that he was very concrete in his thinking and that he would have problems seeing the bigger picture. The results also showed that the Petitioner was impaired in his ability to learn from experience and would make poor judgments repeatedly. Dr. Spica stated that the results of testing the Petitioner's common sense reasoning revealed that he had limited capacity to make decisions and did the same things repeatedly rather than find new ways to solve problems. Dr. Spica explained that many individuals who are impaired in their ability to solve problems and reason through complex situations, such as the Petitioner, become involved in criminal activity.

Dr. Spica testified that the Petitioner was deficient in executive functioning, which he described as the ability to keep track of information to which a person had been exposed and to learn from experience. He said that the Petitioner also had substantial memory deficits.

Dr. Spica administered a "repeatable battery for the assessment of neurological status, neuropsychological status," which was a "multi sub-test" that measured overall neuropsychological status. The test took into account memory, language functioning, and attention and visual abilities. The Petitioner's overall score fell within the second percentile, "far below the normal range." Dr. Spica said such a score generally meant that the Petitioner had cerebral dysfunction, a physical impairment over which the Petitioner had no control.

Dr. Spica stated that these results were difficult to falsify on a test and that the Petitioner passed each malingering test administered.

Dr. Spica did not find strong evidence that the Petitioner was able to think through the consequences of his conduct. Rather, he was subject to impulsive behavior. Dr. Spica said that someone with these types of deficits would perform better in a structured environment, such as prison.

Dr. Spica testified that he tested the Petitioner for paranoid ideation in which a person is suspicious, mistrusting, and obsessive compulsive. Based upon the results of the testing, Dr. Spica did not expect that the Petitioner would provide his life story to a person whom he had just met or that he would distort the information. The Petitioner would more likely be uncooperative. Dr. Spica said that repeated visits with the Petitioner in the jail were a way to build trust so that the Petitioner would share such information. On cross-examination, Dr. Spica testified that he did not request any imaging such as a CAT Scan or an MRI to examine the Petitioner's brain structure.

According to Dr. Spica's report, "[p]sychological testing indicate[d] features of paranoia, depression, and mal-adapted thinking." Dr. Spica met with the Petitioner on December 4, 2009, and January 21, 2010, and spent four hours with him each day. During the first meeting, the discussion about the Petitioner's medical and health status took less than one hour, and the remaining time was spent on testing. The historical information from Dr. Spica's report came primarily from the Petitioner during the initial meeting. Dr. Spica attempted to assess the extent of the Petitioner's alcohol usage to determine whether it affected his brain functioning; however, the Petitioner did not provide Dr. Spica with extensive information regarding his alcohol use. Dr. Spica believed the Petitioner told him that he had started drinking corn whisky at the age of thirteen. Afterward, the Petitioner began binge drinking and drank whenever he could.

Dr. Spica acknowledged that he did not have a baseline to measure the Petitioner's cognitive ability at the ages of eighteen, twenty, or twenty-five. Rather, he measured the Petitioner's cognitive ability as it was at the time of testing. Dr. Spica also acknowledged that the Petitioner was not intellectually disabled.

On redirect examination, Dr. Spica testified that during the initial meeting with the Petitioner, post-conviction counsel came to the prison and introduced Dr. Spica to the Petitioner. Post-conviction counsel also came to the prison during the second meeting and explained to the Petitioner the need for additional testing.

Dr. Spica testified that although the Petitioner was technically not intellectually

disabled, his I.Q. score of 77 was two points away from the intellectually disabled range. On recross-examination, Dr. Spica testified he had no opinion regarding whether the Petitioner was intellectually disabled. Rather, he opined that the Petitioner was "mentally impaired."

Dr. Keith Caruso, a forensic and general psychiatrist in Brentwood, Tennessee, was admitted by the post-conviction court as an expert in psychiatry and forensic psychiatry. Dr. Caruso testified that after evaluating the Petitioner, he recommended neuropsychological testing because he suspected that the Petitioner may have brain damage. He noted that the Petitioner had a history of repeated closed head trauma, alcohol dependence, and violence, which were risk factors for brain damage. Dr. Spica's evaluation established that the Petitioner had brain damage and borderline intellectual functioning.

Dr. Caruso testified that the Petitioner had an I.Q. of 77, which was within the range of borderline intellectual functioning. He explained that some experts considered an I.Q. of 75 to be within the intellectually disabled range. Dr. Caruso, however, relied upon the Diagnostic and Statistical Manual of Mental Disorders (DSM), which provided that someone with an I.Q. of 70 or below was within the intellectually disabled range.

Dr. Caruso said that according to the Petitioner's records, he had many risk factors for violence. The Petitioner was raised in poverty, which had been inextricably linked with violence in many studies. He had two violent parents who abused him and each other. He had very limited education and intelligence and had low verbal skills. Dr. Caruso stated that the Petitioner had a limited set of coping mechanisms and that the primary coping mechanism he was taught in childhood was violence. The other coping mechanism in the family was alcohol. Dr. Caruso said that in addition to the violence that the Petitioner experienced as a child, he also experienced neglect and abandonment. He explained that this type of environment was not conducive to normal development and that those who are raised in such an environment tend to commit criminal acts and develop psychiatric illnesses. The Petitioner ultimately manifested antisocial behaviors.

Dr. Caruso testified that the Petitioner's history of closed head trauma and alcoholism ultimately led to brain damage. At the age of seven, the Petitioner was knocked unconscious with a skillet. The Petitioner was also knocked unconscious in a automobile accident in Memphis in 1962 or 1963; in Virginia in the 1960's or 1970's; in 1990 or 1991 in Collierville, Tennessee, when a tree fell on his head; and in Parchman Prison in Mississippi during a fight with another inmate. Dr. Caruso said each of these injuries contributed to the Petitioner's brain damage and behavior. Dr. Caruso also discussed the beatings, rapes, and other abuse to which the Petitioner was subjected by staff members at Columbia Training School as a teenager.

Dr. Caruso testified that he was unaware of any effort to educate the Petitioner at Columbia. The Petitioner had little education prior to being sent to Columbia. When the Petitioner entered the first grade, his father did not allow him to attend school when he was needed on the farm. School records indicated that the Petitioner attended classes in the first grade more frequently than any other grade and that his attendance was so infrequent that he was only socially promoted to other grades. Dr. Caruso acknowledged that he did not have any of the Petitioner's records from Columbia and that evidence of the abuse was based upon the Petitioner's recollection of the events. Dr. Caruso said the Petitioner's recollection was consistent with the 2003 report of an assistant United States attorney general's investigation into allegations of abuse at Columbia. The doctor was aware of lawsuits in the 1970's against one of the other institutions in Mississippi in which abuse was alleged. Dr. Caruso was also provided with an affidavit from Mark Cunningham regarding his investigation into the conditions of the school over a period of time.

Dr. Caruso stated that the Petitioner endured emotional abuse over the years. He said someone who had endured such abuse would be highly likely to be involved in violent criminal activity. Dr. Caruso also said the Petitioner was not "playing on a level playing field" due to the emotional abuse to which he was subjected and his deficits. He noted that the Petitioner was born with low intelligence and genetic risks for alcoholism and antisocial behavior and that he had multiple instances of head trauma. Dr. Caruso stated that alcohol was essentially the Petitioner's coping mechanism for dealing with the emotional pain of the abuse.

Dr. Caruso diagnosed the Petitioner with cognitive disorder not otherwise specified. He said the Petitioner had deficits in memory, reasoning, mental organization, verbal skills, impulse control, and behavior control. The Petitioner had a history of alcohol dependence and amphetamine and barbiturate abuse. Dr. Caruso diagnosed the Petitioner with antisocial personality disorder. He defined a personality disorder as a "well established long term condition where someone's behavior deviates markedly from the expectations of the general population and it's manifested by problems with impulse control, with thinking, feeling, and perceiving your environment." Those with antisocial personality disorder had a history of conduct disorder before the age of fifteen and a history of illegal behavior from the age of eighteen forward.

Since receiving Dr. Spica's report, Dr. Caruso had not determined whether Dr. Spica's findings affected his diagnosis of antisocial personality disorder. In determining whether to diagnose a person with antisocial personality disorder, Dr. Caruso considered whether the behavior could be accounted for by another medical condition, such as closed head trauma. Dr. Caruso explained that the Petitioner's personality change could be due to closed head trauma. He said data possibly existed to suggest that the Petitioner had both antisocial

personality disorder and a personality change due to closed head trauma. While there was no treatment for antisocial personality disorder, mood stabilizing medication could possibly treat a personality change.

Dr. Caruso said that he considered whether the Petitioner had post-traumatic stress disorder. The Petitioner was not "real insightful" in identifying his feelings or anxiety, and Dr. Caruso determined that the Petitioner did not meet the criteria for post-traumatic stress disorder based upon the Petitioner's self reports. Dr. Caruso noted that elements of the Petitioner's behavior included irritability, outbursts of anger, hyper vigilance, and distrust, and the Petitioner was reluctant to discuss traumatic events.

Dr. Caruso testified that the Petitioner demonstrated distrust, which Dr. Spica had characterized as a paranoid trait. Dr. Caruso stated this distrust was generally not a trait of antisocial personality disorder, but he wondered whether the distrust was a trait of the effects of the closed head trauma and early abuse. Dr. Caruso experienced the Petitioner's distrust during their first meeting. Following the initial meeting, Dr. Caruso called post-conviction counsel and expressed his concern that he would not be able to evaluate the Petitioner due to his lack of cooperation. Counsel met with the Petitioner and explained that he could trust Dr. Caruso. Following that meeting, the rapport between Dr. Caruso and the Petitioner improved and continued to improve over the course of the evaluation. Dr. Caruso said that any failure by the Petitioner to cooperate during the initial meeting with the mitigation specialist was due in part to his psychological conditions.

Dr. Caruso noted that once the Petitioner committed the murders in Mississippi and Tennessee, he drove through several states to Miami, Florida, and then returned to Tennessee. When Dr. Caruso asked him why he returned, the Petitioner said, "I killed a man and a woman and I was done." Dr. Caruso said that it was as if once the Petitioner committed the acts, he discharged much of the rage he had toward his parents.

Dr. Caruso stated that the Petitioner had no disciplinary problems in prison. He acknowledged that the Petitioner had escaped twice while serving sentences on prior convictions. Dr. Caruso described both escapes as "fairly impulsive" and "self defeating." The Petitioner was treated for depression in 1992 and was prescribed anti-depressant medication for some time.

On cross-examination, Dr. Caruso testified that antisocial personality disorder commonly has an addiction component. The Petitioner informed him that he had consumed as much as two-fifths of alcohol a day for most of his life. Dr. Caruso's reference to the Petitioner's abuse of amphetamine was based upon the Petitioner's driving to Florida following the murders and using them to attempt to stay awake. He had also used them

-33-

previously on a sporadic basis. Dr. Caruso noted that approximately sixty percent of prisoners meet the criteria for antisocial personality disorder and approximately eighty-five percent of prisoners meet the criteria for substance abusers.

On redirect examination, Dr. Caruso testified that an attempted suicide was a "red flag" indicating the need for a mental health evaluation. The Petitioner was evaluated at Central State Hospital from March 14 to April 26, 1973, relating to charges of robbery with a deadly weapon and rape. The Petitioner was found to be mentally ill but competent to stand trial. He was also found not to be insane at the time of the offenses. Dr. Caruso said the prior finding of mental illness was also a "red flag" indicating the need for a mental health evaluation. Dr. Caruso found that the Petitioner was competent, was not insane, and was not intellectually disabled.

Howard Wagerman, an attorney who had represented capital defendants in both state and federal courts, was admitted by the post-conviction court as an expert in the area of capital litigation. He described capital cases as time consuming and believed that it would be difficult to handle a large number of capital cases and maintain a private practice. He did not believe that he had represented clients in more than two capital cases at one time due to the time constraints involved.

Mr. Wagerman testified that since the middle to late 1990's, the standard capital defense team had included two attorneys, an investigator, a mitigation expert, and a forensic psychologist. During his representation, he generally wanted the mitigation expert to gather every record about the client from conception, including school, employment, social security, and jail records. In Mr. Wagerman's experience, mitigation experts knew what records should be gathered. Mr. Wagerman said that the mitigation expert would update him on a weekly basis regarding the results of the investigation, including records and summaries of interviews. If information in the records indicated a need for an expert, Mr. Wagerman obtained approval for funding for the expert from the trial court.

Mr. Wagerman said that he reviewed the trial transcript and the transcript of the testimony of the defense team during the post-conviction hearing. He also "scanned" the appellate record and briefs. He testified that Ms. Benson did not perform in accordance with the community standards of a mitigation specialist in a capital case. Mr. Wagerman noted that Ms. Benson seemed to indicate that she knew what she needed to do to gather records but did not complete any tasks until she was directed to do so by trial counsel. Because she never received any direction from trial counsel, she did not do anything on the case. Ms. Benson admitted that she had not gathered any records one month before the trial. Mr. Wagerman stated that in failing to do so, Ms. Benson did not comply with the community standards because a mitigation expert should begin gathering records immediately after being

-34-

assigned to a case.

Mr. Wagerman testified that the defense team met with the Petitioner in March following trial counsel's appointment to the case. Mr. Wagerman did not know whether he had ever been involved in a capital case in which the initial meeting with the client included the entire defense team, but he did not see any issue in doing so. During the meeting in the instant case, the Petitioner told the defense team that there was not anything it could do for him. Mr. Wagerman did not see any other actions taken to prepare for the trial by the defense team until July 2002, approximately one month prior to trial.

Mr. Wagerman explained that typically during his first meeting with a client, the client was depressed, did not want to cooperate, probably acknowledged the crime, and did not realize that there was an opportunity to present mitigating evidence in an effort to avoid the death penalty. Mr. Wagerman said a member of the defense team should build a rapport with the client and convince him that there was a reason to live. The client might be embarrassed to discuss the events of his life. Mr. Wagerman did not see where any member of the defense team visited the Petitioner in an attempt to build a rapport and obtain his cooperation. He said that although the Petitioner refused to sign releases in order for Ms. Benson to obtain his records, there were multiple ways to obtain records without a signed release, including issuing a subpoena for the records.

Mr. Wagerman testified that he had a forensic psychologist or psychologist evaluate his client in every capital case. He said that based upon his experience, the seminars that he had attended, and his interaction with other capital attorneys, he believed that a mental health evaluation was required by community standards. He did not believe that, as a layman, he could determine whether his clients had any mental health issues. Several areas that needed to be evaluated included competency, insanity, and diminished capacity.

Mr. Wagerman noted that Lead Counsel's explanation for not seeking funds for a psychologist or psychiatrist was that the Petitioner was not "crazy." Mr. Wagerman said that "crazy" was not appropriate legal terminology in a death penalty case. Rather, the issue was whether the client was competent, insane, intellectually disabled, or had a mental disease or defect. Mr. Wagerman "strongly" disagreed with Lead Counsel's reasoning for not seeking to have the Petitioner evaluated. He said Dr. Caruso's report constituted "powerful mitigation."

Mr. Wagerman said that "a lawyer is not able to detect whether or not a client has something going on there that would be mitigation or competency or insanity or what have you, and that you must bring a profession in every time, every case." He noted that the Petitioner was on "psych" medication and had been hospitalized in a mental health facility

-35-

in Nashville in 1972. Mr. Wagerman also identified notes from the Petitioner's defense team in Mississippi, which revealed that the Petitioner had wanted to undergo a mental health evaluation because he was suicidal. Mr. Wagerman described the information as a "red flag" indicating the need for a mental health evaluation.

Mr. Wagerman stated that Co-Counsel's involvement in the case consisted of monthly meetings with the entire capital case team, during which they discussed all of their cases. He understood that the capital case team was assigned thirty or more cases. Co-Counsel did not prepare any motions, and Mr. Wagerman did not believe that she attended the suppression hearing. He understood that Co-Counsel visited the Petitioner only during the initial meeting and did not know whether Co-Counsel attended the July 2002 meeting with the Petitioner. Co-Counsel was not asked to interview witnesses or complete any tasks in preparation for trial. At trial, Co-Counsel did not question any witnesses and did not really participate in voir dire; however, she participated in bench conferences. Mr. Wagerman said that he was unable to determine how Co-Counsel functioned as an attorney in the case.

Mr. Wagerman testified that considering the capital case team's case load, "I don't really know if they really had a grip on what was going on with all these cases, and I guess they were just doing the best they could to manage. But that is not, in my opinion, the way to handle a capital case." He said that if counsel could not "do the job right," counsel should have declined the appointment.

Mr. Wagerman found no theory of defense presented in either phase of the trial. He described the facts of the case as "horrific." He said, "I really didn't look at it that hard but looking at the proof the State had it looked overwhelming, and I think you're going to find yourself without question in the second penalty phase." As a result, Mr. Wagerman declined to "say that anything wrong was done in the guilt phase."

On cross-examination, Mr. Wagerman testified that in preparing for his testimony, he did not interview Lead Counsel, Mr. Nally, or Ms. Benson, and only spoke to Co-Counsel "in passing." Mr. Wagerman also did not talk to the Petitioner about his childhood and family history. Rather, he obtained the information from Dr. Caruso's report and from the summaries of interviews that Ms. Benson conducted. Mr. Wagerman acknowledged that the facts of the case were "bad" but said that was the situation in most capital cases.

On redirect examination, Mr. Wagerman testified that the community standards for representation of capital defendants in the area and across the nation did "not correspond in any respect whatsoever with anything [Lead Counsel] did in this case." He said, "I can't think of one aspect of the case that [Lead Counsel] . . . covered correctly."

## POST-CONVICTION COURT'S FINDINGS

Following the post-conviction hearing, the post-conviction court entered an order denying relief regarding the guilt phase and granting relief regarding the penalty phase. The court rejected the Petitioner's claim that trial counsel were ineffective in failing to investigate and present all available defenses during the guilt phase. Mr. Wagerman described the facts surrounding the victim's death as "horrific" and the State's case as "overwhelming." The court noted that the Petitioner confessed to the murder, led law enforcement to the victim's body, and provided little assistance or cooperation in preparing his defense. The court also noted that both Dr. Spica and Dr. Caruso testified that the Petitioner was not intellectually disabled and did not have a mental disease or defect that would support either insanity or diminished capacity. The Petitioner did not specify the defense that counsel should have pursued. The court found that based upon the evidence presented at the trial and the post-conviction hearing, there were no viable defenses that trial counsel failed to pursue.

The post-conviction court rejected the Petitioner's claim that counsel were ineffective in failing to establish a working relationship and a division of labor that properly provided him with two attorneys. The court relied upon Co-Counsel's testimony that Lead Counsel preferred to prepare the defense and cross-examine witnesses, that the defense team met regularly and discussed the Petitioner's case, and that she offered suggestions at the trial regarding Lead Counsel's cross-examination of witnesses. The court stated that the Petitioner "had little in the way of viable defenses" and that based upon the strength of the State's proof, "there was little to contest in the State's guilt phase case." The court found that counsel were not ineffective in their management of the case or that their arrangement deprived the Petitioner of his right to representation by two attorneys.

The post-conviction court found that counsel were not ineffective in their efforts to develop a relationship with the Petitioner. The court noted that counsel met with the Petitioner at the jail on only two occasions: the initial meeting and the meeting just before the trial. The court, however, accredited Lead Counsel's testimony that while he did not visit the Petitioner at the jail routinely, he often met with the Petitioner following court appearances in the meeting room located in the holding area attached to the courtroom. The court stated that the relationship between counsel and the Petitioner was "strained" initially. The court also stated that it appeared that the Petitioner never established a rapport with Mr. Nally and Ms. Benson and that he did not have a strong relationship with Co-Counsel. The court, however, found no proof contradicting the testimony of trial counsel and other members of the defense team that Lead Counsel was able to develop a rapport with the Petitioner over time.

The post-conviction court found that trial counsel were not ineffective in failing to

-37-

challenge the Petitioner's arrest by officers from the Mississippi Highway Patrol. The court noted that the Petitioner was arrested just over the state line in Tennessee by officers from the Mississippi Highway Patrol who tracked him through Mississippi on suspicion that he committed a murder in Mississippi shortly before killing the victim in Tennessee. The court noted that the Petitioner was advised of the pending charges in Mississippi and that he could have refused to return to Mississippi, after which the officers could have sought extradition, or that he could have signed a waiver of extradition and been transported immediately to Mississippi. The Petitioner signed the waiver, and Sheriff East took him into custody.

The post-conviction court rejected the Petitioner's claim that trial counsel were ineffective in failing to engage in efforts to elicit a plea agreement and settle the case with a sentence less than death. The court stated that it was unclear whether Lead Counsel's testimony that the State had indicated it would not settle the case was based upon his own efforts to settle the case or a comment by the prosecutor preempting such discussion. The court found that it was unlikely that the State would have settled the case given that the Petitioner's own attorney expert described the murder as "horrific" and the State's case as "overwhelming."

## ANALYSIS

On appeal, the Petitioner contends that he received ineffective assistance of counsel during the guilt phase of his trial. The right to counsel is "'so fundamental and essential to a fair trial, and . . . to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose

-38-

result is reliable.

Id. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Id. at 690; see also Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006). Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S at 694; see also Smith v. State, 357 S.W.3d 322, 337 (Tenn. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In evaluating whether a petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in

an acquittal." State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id. at 225.

Claims of ineffective assistance of counsel are regarded as mixed questions of law or fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the evidence preponderates against the findings. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). A post-conviction court's conclusions of law are reviewed de novo, with no presumption of correctness. Id.

The Petitioner contends that trial counsel were ineffective due to their alleged failure to conduct any meaningful factual investigation or otherwise prepare for the trial and their failure to seek a mental health evaluation. He also contends that trial counsel were ineffective in failing to (1) seek a change of venue or use a jury questionnaire; (2) challenge the legality of his arrest; and (3) rehabilitate jurors. The Petitioner asserts that such deficiencies justified a presumption of prejudice under the standard announced in United States v. Cronic, 466 U.S. 648 (1984). He asserts that, in the alternative, counsel's failure to conduct an investigation or otherwise prepare for trial resulted in actual, demonstrable prejudice under the Strickland standard.

### A. Failure to Investigate and Prepare for Trial

The Petitioner contends that trial counsel failed to investigate his case and prepare for the guilt phase of his trial, that trial counsel failed to have him evaluated by a mental health professional, and that Co-Counsel failed to investigate his case and otherwise participate in his defense. He challenges Mr. Nally's qualifications as an investigator and counsel's failure to utilize his services.

### 1. Deficiency

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> [n]o particular set of detailed rules for counsel's conduct can
> satisfactorily take account of the variety of circumstances faced

-40-

by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and [j]udicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *48 (Tenn. Crim. App. at Jackson, July 1, 2009) (addressing mitigation investigation). "Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. Moreover,

the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691.

Counsel has a duty to investigate and prepare a case, and this duty derives from counsel's basic function "to make the adversarial testing process work in the particular case." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986). There is, however, no rule requiring defense counsel to retain experts or investigators in every capital case. See e.g., Andre Bland v. State, No. W2007-00020-CCA-R3-PD, 2009 WL 910197, at *41 (Tenn. Crim. App. at Jackson, Apr. 3, 2009) (holding that trial counsel was not ineffective in failing to retain a mitigation expert); Tyrone Chalmers v. State, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *28 (Tenn. Crim. App. at Jackson, June 25, 2008) (holding that trial counsel was not ineffective in failing to retain an investigator). This court has recognized that, "especially in cases where the defendant faces the death penalty, it is a much better practice for counsel to hire an investigator to assist in investigating the case." John Michael Bane v. State, No. W2009-01653-CCA-R3-PD, 2011 WL 2937350, at *22 (Tenn. Crim. App. at Jackson, July 21, 2011), perm. to appeal denied, (Tenn. Mar. 7, 2012).

Mr. Nally testified that he had been a criminal investigator with the Shelby County Public Defender's Office for thirty years and began investigating capital murder cases in

1981. He received training from the previous capital investigator. He estimated that he had investigated three to five hundred criminal cases during his career. In arguing that Mr. Nally lacked the qualifications required for a capital case investigator, the Petitioner focuses upon Mr. Nally's lack of a state license or formal education and training. Based upon Mr. Nally's extensive experience in investigating capital cases, however, we conclude that Mr. Nally was qualified to serve as an investigator in the Petitioner's case.

Regardless of Mr. Nally's qualifications, counsel did not utilize his services in the Petitioner's case. Moreover, trial counsel did little in the investigation of the case. Co-Counsel took no part in the investigation and only met with the Petitioner on two occasions. The only witness that Lead Counsel could recall interviewing was Ms. Cochran. Lead Counsel also questioned the various law enforcement officers during the suppression hearing. We acknowledge that the necessary tasks to be completed in investigating a criminal case depend upon the facts and circumstances of the particular case. Nevertheless, we conclude that a much more thorough investigation was required in a capital case than was conducted by trial counsel in the present case.

While the Petitioner initially was uncooperative, no member of the defense team, other than Lead Counsel, attempted to establish a rapport with him. The Petitioner began to "open up" to Lead Counsel approximately one month prior to trial. Trial counsel, however, never sought to continue the trial based upon the need to conduct further investigation.

Trial counsel had the means to obtain information regardless of the Petitioner's cooperation. The Petitioner's educational records, juvenile records, and prison or jail records could have been obtained through subpoena or court order. As Ms. Shettles testified, the records included information related to the Petitioner's mental health. Moreover, the court records from a prior conviction in Tennessee referenced the Petitioner's prior treatment at a mental health facility. The defense made no effort to review these records, and Lead Counsel said he did not seek a mental health evaluation of the Petitioner because the Petitioner did not act "crazy."

Due process of law principles require the appointment of expert assistance at a trial when the defendant establishes that such assistance is necessary to conduct a constitutionally adequate defense. See State v. Barnett, 909 S.W.2d 423, 426-28 (Tenn. 1995). The Tennessee Supreme Court has held that "[w]hile a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy, . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools of an adequate defense or appeal.'" Id. at 426 (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)).

The obligation of a trial court to afford an indigent defendant with the benefit of

expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. See Tenn. Sup. Ct. R. 13, § 5(c)(1); Barnett, 909 S.W.2d at 430-31. In the context of criminal trials and appeals, particularized need is established

> when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2). Particularized need cannot be established and the court should deny funding requests when the motion for such funding includes only:

> (A) undeveloped or conclusory assertions that such services would be beneficial;
>
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
>
> (C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or
>
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Id. at (c)(4).

Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. Barnett, 909 S.W.2d at 431. The defendant must refer to the facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to insure a fair trial. Id. The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. Id.

Trial counsel were aware that the Petitioner reported that he had taken "psych meds," had been treated in a mental health facility, and had been abused while enrolled in reform school. Dr. Mooers stated in his letter that the Petitioner reported suffering multiple head injuries. Relatives reported to the defense team that the Petitioner was abused as a child by his father and that the Petitioner had a "split personality." The defense team was also aware

that the Petitioner's brother had a history of mental health problems. Had trial counsel gathered the Petitioner's prison records, they would have learned that the Petitioner received mental health treatment while in jail and had reported being depressed and suicidal. Records from the Petitioner's prior convictions in Shelby County in 1972 included a certificate stating that the Petitioner was committed to a mental heath facility and was competent even though he had a mental illness.

In light of the information that trial counsel had and the information that trial counsel should have gathered, Lead Counsel's lay opinion that the Petitioner was not "crazy" was insufficient to justify the decision to not seek a mental health evaluation. The information available established particularized need for funding for a mental health expert. We conclude that trial counsel were deficient in failing to have the Petitioner evaluated by a mental health expert.

## 2. Presumed Prejudice

The Petitioner argues that the post-conviction court erred in applying the Strickland standard for ineffective assistance of counsel analysis and should have analyzed his allegations under the standards set forth in Cronic, which addresses claims that raise a presumption of prejudice and absolve the Petitioner from the need to prove the Strickland elements of ineffective assistance of counsel. In Cronic, the United States Supreme Court identified three scenarios involving the right to counsel where the situation was "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. 658-60. Under such circumstances, an irrebuttable presumption of prejudice exists, and the petitioner need not meet the elements of Strickland to prove ineffective assistance of counsel. Id. at 662. These scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceedings; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60; see also Berry v. State, 366 S.W.3d 160, 174 (Tenn. Crim. App. 2011).

In his brief, the Petitioner argues, "A simple analysis of the work performed by each of the defense team members in this case leads to only one conclusion, that [the Petitioner] was simply denied his right to any representation." He also argues that "trial counsel was so inadequate in this capital matter that in effect no assistance was provided by anyone." Regardless, none of the scenarios set forth in Cronic are present in this case.

The first scenario discussed in Cronic involves "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage." Cronic, 466 U.S. at 659. Courts have presumed prejudice under this first scenario when counsel was not appointed until the morning of the trial, see Powell v. Alabama, 287 U.S. 45, 57 (1932), and when counsel only met with the defendant for a total of six minutes and was suspended from the practice of law for the last month before the trial, see Mitchell v. Mason, 325 F.3d 732, 742-44 (6th Cir. 2003). The Petitioner appears to argue that due to the lack of an investigation and any meaningful preparation by trial counsel, he was effectively denied his right to counsel at the trial. While trial counsel failed to conduct a thorough investigation and seek a mental health evaluation, these deficiencies did not result in the complete denial of counsel. Counsel reviewed discovery, interviewed witnesses, challenged in federal court the officers' actions in transporting the Petitioner from Mississippi to Tennessee and back to Mississippi, filed a motion to suppress the Petitioner's statements to law enforcement, and questioned witnesses during the suppression hearing. During the guilt phase of the trial, counsel presented argument to the jury, cross-examined the State's witnesses, elicited testimony regarding the Petitioner's cooperation and expressions of remorse, and argued points of law to the trial court. Accordingly, this case was not one in which the Petitioner suffered the complete denial of counsel during a critical stage of the proceeding.

The second scenario discussed in Cronic is a situation where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Cronic, 466 U.S. at 659. In Bell v. Cone, 535 U.S. 685, 696-97 (2002), the United States Supreme Court limited this scenario to those situations where counsel's "failure to test the prosecutor's case" was "complete." In Cone, the Court characterized Cone's argument as "not that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that his counsel failed to do so at specific points" and held that the issues should be examined under the standard in Strickland rather than the standards in Cronic. Cone, 535 U.S. at 697.

We cannot conclude that trial counsel completely failed to test the prosecutor's case during the guilt phase of the trial. Lead Counsel met with the Petitioner, interviewed witnesses, filed pretrial motions, cross-examined the State's witnesses, and presented argument to the jury. The post-conviction court found that the Petitioner "had little in the way of viable defenses" and that based upon the strength of the State's proof, "there was little to contest the State's guilt phase case." As recognized in Cronic, "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." Cronic, 466 U.S. at 657 n.19. Even if no theory of defense is available and the decision is made to go to trial, "counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt." Id. The record establishes that counsel challenged the State's case and subjected it to adversarial testing at

-45-

the Petitioner's trial, which this court has described as "the primary arena of true adversarial testing in our system of justice." Berry, 366 S.W.3d at 174; see also Cronic, 466 U.S. at 656 ("When a true adversarial criminal trial has been conducted–even if defense counsel may have made demonstrable errors–the kind of testing envisioned by the Sixth Amendment has occurred.").

The Petitioner does not argue, nor has he established, the third scenario in Cronic. See Cronic, 466 U.S. at 659-60. Accordingly, like the post-conviction court, we will review the Petitioner's claims of ineffective assistance of counsel under the Strickland standard, which requires the Petitioner to show both a deficiency in counsel's performance and actual prejudice.

### 3. Prejudice under the Strickland Standard

As found by the post-conviction court, the Petitioner "had little in the way of viable defenses," and due to the strength of the State's proof, "there was little to contest in the State's guilt phase case." Mr. Wagerman, the Petitioner's own expert, described the evidence as "overwhelming" and testified that he could not "say anything wrong was done in the guilt phase." The evidence presented by the State during the guilt phase included the Petitioner's statements and his actions in leading law enforcement to the rural area where he hid the victim's body. Based upon the overwhelming evidence of the Petitioner's guilt, we cannot conclude that any deficiency by counsel in the investigation relating to the guilt phase of the trial resulted in prejudice.

With regard to trial counsel's failure to seek a mental health evaluation, we note that the testimonies of Dr. Spica and Dr. Caruso were relevant to issues of mitigation and not to issues presented in the guilt phase. Their testimonies did not establish that the Petitioner was insane or had diminished capacity or that his mental condition otherwise negated premeditation or intent. Trial counsel's failure to seek a mental health evaluation did not result in prejudice in the guilt phase of the trial.

The Petitioner argues that counsel's failure to investigate and present evidence during the penalty phase of his trial should be considered in determining whether counsel were ineffective in the guilt phase. The Petitioner, however, has failed to present any mitigating evidence that also would have been admissible or otherwise relevant to the issues that arose in the guilt phase. Rather, the appropriate form of relief for counsel's failure to investigate and present mitigating evidence is a new sentencing hearing, the relief granted by the post-conviction court.

### B. Failure to Seek a Change of Venue or Use a Jury Questionnaire

The Petitioner contends that trial counsel were ineffective in failing to seek a change of venue due to the publicity in the case and in failing to use a jury questionnaire to determine the effect of the publicity on the potential jurors. In making this claim in his brief, the Petitioner offers no other citations to the record, no citation to any legal authority, and no argument to support his assertion that he is entitled to relief based upon these allegations. See Tenn. Ct. Crim. App. R. 10(b). The Petitioner also failed to raise these claims in his initial or amended petition for post-conviction relief, and the post-conviction court did not address these issues in its order. Therefore, we conclude that these issues are waived. See Tenn. Code Ann. § 40-30-106(g) (providing that a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented").

### C. Failure to Challenge the Legality of the Petitioner's Arrest

The Petitioner asserts that trial counsel were ineffective in failing to challenge the legality of his arrest. The Petitioner's entire argument in his brief on the issue consists of one statement that Lead Counsel "also did not file any motions challenging the arrest of [the Petitioner] in Tennessee involving members of the Mississippi Highway Patrol who subsequently took [the Petitioner] back to Tennessee." The Petitioner cites only one page in the transcript and fails to cite to any legal authority or include any argument regarding the basis upon which he relies in asserting that his arrest was illegal. Accordingly, he has risked waiving the issue. See Tenn. Ct. Crim. App. R. 10(b).

Regardless, the Petitioner is not entitled to relief. Based upon the Petitioner's statement in his brief and post-conviction counsel's questioning of Lead Counsel during the hearing, the Petitioner appears to assert that the arrest was illegal because it was made by a Mississippi officer outside this jurisdiction. Lead Counsel testified that he did not believe that he had any basis for challenging the Petitioner's arrest. Lead Counsel believed that officers from Hardeman County, Tennessee, also participated in the arrest. Mississippi Highway Patrol Lieutenant Rick Marlar's testimony at trial was consistent with Lead Counsel's testimony at the post-conviction hearing that Hardeman County officers participated in the arrest. The Petitioner presented no evidence at the post-conviction hearing regarding the circumstances of his arrest. The Petitioner is not entitled to relief with regard to this issue.

### D. Failure to Rehabilitate Jurors

The Petitioner presents a one-sentence argument in his brief that he was "prejudiced by the failure of trial counsel to properly rehabilitate jurors as testified to by Howard

Wagerman." In making this claim in his brief, the Petitioner offers no other citations to the record, no citation to any legal authority, and no argument to support his assertion that he is entitled to relief based upon these allegations. Therefore, he has again risked waiving the issue. <u>See</u> Tenn. Ct. Crim. App. R. 10(b). In any event, any argument that trial counsel were ineffective in failing to rehabilitate potential jurors regarding their views of the death penalty is moot because the post-conviction court granted the Petitioner a new sentencing hearing.

## CONCLUSION

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief as it relates to the guilt phase of his trial. Accordingly, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE